UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| CITY NATIONAL BANK and RA SOUTHEAST LAND COMPANY, LLC,<br><br>   Appellants,<br> v.<br><br>CHARLESTON ASSOCIATES, LLC,<br><br>   Appellee. | Case No. 2:11-cv-02023-MMD-PAL<br>Case No. 2:11-cv-02104-MMD-NJK<br><br>ORDER |

Before the Court are Appellants City National Bank, N.A. ("CNB") and RA Southeast Land Company, LLC's ("RAS") appeals from the United States Bankruptcy Court for the District of Nevada's December 1, 2011, Supplemental Order on Summary Judgment Motions. (*See* dkt. nos. 11 and 12.) The Court held oral argument on July 10, 2013, on the appeals. Based on the reasoning set forth below, the Bankruptcy Court's Order is reversed.

**I. BACKGROUND**

 **A. Factual History**

  **1. The Property**

This case arises out of the real estate foreclosure of a large shopping complex in the Summerlin community of Las Vegas, Nevada. In January 2001, Charleston Associates, LLC ("Charleston") owned approximately 41 acres of land to be developed as a shopping center (the "Shopping Center"). (Dkt. no. 11, exhs. 1–13 ("Appendix to Br.") at 321, ¶ 6.) This plot of land was divided into two parcels, an 18-acre parcel later developed into what is now commonly known as the Boca Fashion Village, and an approximately 23-acre parcel of undeveloped land adjacent to the Boca Fashion Village ("Undeveloped Land"). (Appendix to Br. at 321, ¶ 6.) Charleston intended to develop the

entire Shopping Center into an integrated retail development, and secured national and regional retail tenants on the parcel it later developed. (Appendix to Br. at 321, ¶ 8.)

### 2. The REA

On January 31, 2001, Charleston promulgated a Grant of Reciprocal Easements and Declaration of Covenants (the "REA") providing that the Shopping Center shall be subject to the "easements, restrictions, covenants and conditions" described therein. (Appendix to Br. at 337–372 ("REA").) The REA designates Charleston as the "Declarant," and creates certain rights and obligations with respect to the Shopping Center that are the subject of this appeal (the "Declarant Rights"). (REA at § 1.5.)[1] The Declarant Rights consist of, among others, the right to control the development of the Shopping Center, including oversight over construction and development of the Shopping Center, and the right to limit the use and leasing of the premises, as well as the obligation to maintain in good condition the various common areas within the Shopping Center (e.g. roads, entryways, parking structures, landscaping, public utilities, etc.). (*See, e.g.*, REA at §§ 3.8 (initial construction rights), 4.1 (maintenance and repair of common areas), and 9.1 (right to limit permitted uses of property).) The REA also provides for assignment of the Declarant Rights "[u]pon sale or transfer by the Declarant of its interest in the Shopping Center with a concurrent or subsequent transfer of its obligations as Declarant." (*See* REA at § 11.8.)[2]

///

---

[1] The REA defines the Declarant as: "Charleston Associates, LLC, a Delaware limited liability company, its successors and assigns, if such successor and assigns should acquire all or substantially all of the then Declarant's property in the Shopping Center and such successors or assigns assume the obligations of Declarant thereunder." (REA at § 1.5.)

[2] This section reads in full: "Upon sale or transfer by the Declarant of its interest in the Shopping Center with a concurrent or subsequent transfer of its obligations as Declarant to the purchaser or transferee and the purchaser's or transferee's assumption of such obligations, Declarant shall be released from the obligation as the Declarant under this Declaration arising after purchaser's or transferee's assumption of such obligations (while remaining liable for its obligations arising before such time), and such transferee or purchaser shall then become the Declarant hereunder as if originally named as the Declarant hereunder."

### 3. Conveyances of Declarant Rights

After the drafting of the REA, Charleston describes a series of conveyances it argues resulted in the transfer of the Declarant Rights to several of its affiliate entities. Appellants challenge the authenticity of these transfers. According to Charleston, on August 27, 2002, Charleston conveyed Boca Fashion Village to Shops as Boca Park-Phase II, LLC ("SBP-II"), and recorded a Grant Bargain and Sale Deed. (Appendix to Br. at 321, ¶ 18.) The Grant Bargain and Sale Deed memorializes the sale of "real property" to SBP-II, but makes that sale "[s]ubject to: . . . Covenants, Conditions, Restrictions, Reservations, Rights, Rights of Way, and Easements now of record." (Appendix to Br. at 376.) No transfer of the Declarant Rights appears to have been recorded, though Charleston represents that it immediately thereafter ceded its Declarant Rights to SBP-II. (Appendix to Br. at 323-24, ¶ 20.) According to the declaration of the secretary of Charleston's manager entity, SBP-II expended over $2 million in the discharge of its obligations as Declarant. (Appendix to Br. at 324, ¶ 21.)

On December 20, 2004, SBP-II transferred the same site to another entity, Boca Fashion Village, LLC ("BFV LLC"), and recorded a similar Grant Bargain and Sale Deed. (Appendix to Br. at 324, ¶ 24.) Like the previous conveyance, this Grant Bargain and Sale Deed transferred the real property subject to "[a]ll covenants, conditions, restrictions, reservations, rights, right-of-way and easements recorded against the Land." (Appendix to Br. at 381.) No transfer of the Declarant Rights to BFV LLC was recorded or documented. BFV LLC expended over $6 million in the discharge of its Declarant obligations up through 2010. (Appendix to Br. at 321, ¶ 26.)

### 4. City National Bank loan

On September 24, 2007, Charleston borrowed $30 million from CNB, $23 million of which was secured by a deed of trust. (Appendix to Br. at 321, ¶ 27; Appendix to Br. at 23–42 ("Deed of Trust").) Pursuant to the Deed of Trust, Charleston agreed to grant, transfer, convey, and assign to the trustee for CNB's benefit all of its interests in the Undeveloped Land together with "all rights that [Charleston] may have as declarant

under any covenants, conditions or restrictions affecting the [Undeveloped Land]." (Deed of Trust at ¶ Q.)  The Deed of Trust further stated that it "is intended to constitute a security agreement between [Charleston] and [CNB] and [Charleston] hereby grants to [CNB] a security interest in each item or component of the Trust Estate in which a security interest may be granted under the Uniform Commercial Code."  (Deed of Trust at § 14.11.)  In addition, CNB recorded a UCC Financing Statement with the office of the Nevada Secretary of State identifying its security interest in, among other things, "all rights that Debtor may have as declarant under any covenants, conditions or restrictions affecting the [Undeveloped Land]." (Appendix to Br. at 404.)

Charleston subsequently defaulted on its loan obligations in 2008, and had an outstanding unpaid balance of more than $25 million. (Appendix to Br. at 326, ¶ 35; Appendix to Br. at 414.) Comprehensive negotiations over the default ensued, and culminated in a settlement agreement effective as of July 21, 2009 ("Settlement Agreement"). (Appendix to Br. at 414-431.) The Settlement Agreement provides that CNB would "foreclose or cause the occurrence of a deed of trust sale with respect to the Deed of Trust, in accordance with applicable state law." (Appendix to Br. at 416, § 2.1(a).)  Charleston represents that during the approximately seven month negotiation, the Declarant Rights were never discussed, and the parties did not contemplate CNB's foreclosure of these rights.  (Appendix to Br. at 327, ¶¶ 41–43.)

In initiating the subsequent foreclosure sale called for by the Settlement Agreement, the Trustee under the Deed of Trust issued a Notice of Trustee's Sale informing Charleston that a "[s]ale will be held by a duly appointed trustee as shown below, of all right, title, and interest conveyed to and now held by the trustee in the hereinafter described property under and pursuant to the Deed of Trust." (Appendix to Br. at 433.) CNB submitted the winning bid at the foreclosure sale, memorialized in a Trustee's Deed Upon Sale.  (Appendix to Br. at 439.)  The Deed Upon Sale documented the Trustee's grant and conveyance to CNB of only "the real property in the County of

///

4

Clark" described in the attached exhibit, without reference to any other collateral. (Appendix to Br. at 429.)

### 5. Dispute concerning Declarant status

In September 2009, BFV LLC recorded an Amendment to Grant of Reciprocal Easements and Declaration of Covenants (the "REA Amendment") purporting to amend the REA to name itself as the Declarant pursuant to Section 1.5 of the REA. (Appendix to Br. at 444-48.) BFV LLC subsequently merged into Charleston in March 2010. According to Charleston, this merger resulted in Charleston becoming the Declarant for the first time since 2002.

Shortly thereafter, in June 2010, Charleston filed a Chapter 11 bankruptcy petition in the Delaware Bankruptcy Court. In the same month, and after learning of the REA Amendment, CNB contacted Charleston requesting that Charleston rescind the Amendment and confirm that CNB became the Declarant after the foreclosure sale. Charleston refused to do so. Thereafter, and, according to CNB, without knowledge of the bankruptcy petition's filing and its automatically-imposed bankruptcy stay, CNB recorded on July 29, 2010, a "Memorandum of Transfer and Acceptance of Declarant's Rights and Assumption of Obligations" in order to "evidence its assumption of the obligations of the Declarant under the Declaration." (Appendix to Br. at 461–67 at ¶ J.) On August 11, 2009, also purportedly without knowledge of the bankruptcy petition's filing, the Trustee re-recorded the Deed Upon Sale with an amendment expressly recognizing the transfer of the Declarant Rights to CNB. (Appendix to Br. at 450–56.) Thereafter, CNB sold the foreclosed collateral, including the Declarant Rights, to RAS.

### B. Procedural history

At the time of its bankruptcy petition, Charleston did not claim any interest in the foreclosed property or in the Declarant Rights in its bankruptcy schedules. After amendment of its petition to claim ownership of the Declarant Rights, Charleston commenced an adversary proceeding against CNB and RAS in the Delaware Bankruptcy Court, which was subsequently moved to the Nevada Bankruptcy Court. On

February 25, 2011, Charleston filed an Amended Complaint in that proceeding seeking a declaration that it is the rightful owner of the Declarant Rights.

In a hearing held on July 25, 2011, Bankruptcy Judge Linda B. Riegle concluded that Charleston is the Declarant under the REA, and that CNB and its Trustee's post-bankruptcy petition recordings violated the automatic stay. (Appendix to Br. at 642-722); *see Charleston Assocs., LLC v. RA Southeast Land Co., LLC (In re Charleston Assocs.)*, Adv. Case No. 10-01452-LBR (Bankr. D. Nev. Oct. 5, 2011), ECF No. 120. Judge Riegle based her decision on § 11.8 of the REA, which outlines the procedures for the assignment of the Declarant Rights. That section states the following:

> Upon sale or transfer by the Declarant of its interest in the Shopping Center with a concurrent or subsequent transfer of its obligations as Declarant to the purchaser or transferee and the purchaser's or transferee's assumption of such obligations, Declarant shall be released from the obligations as the Declarant . . . .

(REA at § 11.8.) Relying on this language, Judge Riegle identified a three-step process for relinquishing the Declarant Rights: a sale of the property, then a concurrent or subsequent transfer of the obligations, and the purchaser's or transferee's assumption of these obligations. (*See* Appendix to Br. at 715:9–12.) Finding that no transfer of the Declarant obligations to CNB occurred, nor any assumption of these obligations by CNB, Judge Riegle held that Charleston was the proper holder of the Declarant Rights, and that CNB violated the automatic stay imposed upon Charleston's bankruptcy filing. (*See* Appendix to Br. at 716.) After making supplemental findings of facts and conclusions on November 8, 2011, Judge Riegle denied CNB and RAS's Motions for Summary Judgment, declared Charleston to be the Declarant as of January 31, 2011, and held that CNB and RAS violated the automatic stay. (*See* dkt. no. 1-1.) Both CNB and RAS appealed, and the appeals were consolidated into this case. (*See* dkt. no. 10.)

## II. STANDARD OF REVIEW

The Bankruptcy Court's conclusions of law are reviewed de novo, and its factual findings are reviewed for clear error. *See Blausey v. U.S. Tr.*, 552 F.3d 1124, 1132 (9th Cir. 2009). The Ninth Circuit applies the same standard of review to the Bankruptcy

1  Court's rulings as the district court does and affords no deference to the district court's
2  appellate rulings. *See In re AFI Holding, Inc.*, 525 F.3d 700, 702 (9th Cir. 2008).

**III.   DISCUSSION**

Due to the relative complexity of the issues involved in this appeal, the resolution of a number of interrelated questions will determine the proper holder of the Declarant Rights. The threshold question that the Court must first answer is the identity of the Declarant Rights' holder at the time of the foreclosure. Assuming Charleston held the Rights at the time of the foreclosure, the next question is whether those Rights were foreclosed upon by CNB and whether the Rights independently run with the land.

**A.   Did Charleston hold the Declarant Rights at the time of the 2007 foreclosure?**

Charleston argues that it transferred the Declarant Rights to SBP-II in 2002, which in turn transferred the Rights to BFV. Only six months after CNB foreclosed on the 23 acres of undeveloped land did Charleston come back into possession of the Declarant Rights. CNB and RAS reject this argument, arguing that the transfers are unsupported by evidence and, even if they were executed orally, violate the Statute of Frauds.  The Bankruptcy Court overlooked this argument, and assumed (without deciding) that Charleston did in fact retain the Declarant Rights during the foreclosure.

**1.   Oral transfer of Declarant Rights**

Charleston has not provided any evidence to demonstrate that it transferred the Declarant Rights to any other entities before CNB's foreclosure. There are no written documents evidencing any transfer of the Declarant Rights. The only documented evidence available concerning the ownership status of the Declarant Rights vis-a-vis these downstream entities is BFV's filing of the REA Amendment that names itself as Declarant. But the Amendment was filed in September 2009, one month after CNB

///
///
///

foreclosed on the property.[3] Regardless of its veracity, the Court finds that the REA Amendment is not probative of the question of the proper ownership of the Declarant Rights.

In support of its argument, Charleston cites the uncorroborated statements made in the declaration of Jeffrey P. Dragovich, the secretary for Charleston's management company. Dragovich states that around August 2002, "Charleston transferred its obligations under the REA to SBP-II, and SBP-II assumed those obligations." (Appendix to Br. at 323, ¶ 19.) According to Dragovich,

> Charleston immediately ceded its Declarant rights and responsibilities to SBP-II, arranged for utility service and other accounts to be put in the name of SBP-II, notified Shopping Center tenants of the transfer, and transferred escrowed security deposits and common area maintenance ('CAM') contributions to SBP-II. For its part, as noted above, SBP-II immediately jumped into its role as Declarant – managing the property, providing required goods and services, paying bills, operating and maintaining the Common Area, furnishing utilities, landscaping, and insurance, paying taxes, and paying all other costs incurred in such operation and maintenance.

(Appendix to Br. at 323–24, ¶ 20.) When SBP-II purportedly transferred the Declarant Rights to BFV, BFV undertook the same operations and duties as outlined above. (Appendix to Br. at 324–25, ¶ 25.)

As CNB rightly points out, the REA provides an avenue for the Declarant to enter into an independent agreement with a third party in order to maintain the Common Area and perform various of its obligations as Declarant. (*See* REA at § 4.4.) CNB notes that substantial other rights provided to the Declarant were not among those listed as being performed by SBP-II and BFV, including approving plans and drawings for improvements, maintaining architectural schemes of the Shopping Center, approving exterior modifications, and granting exclusive use rights. Accordingly, the fact that these entities assumed some, but not all, of the obligations associated with the Declarant

---

[3]CNB also points to an inaccuracy in the REA Amendment, which specifically says that BFC took its interest directly from Charleston, instead of from SBP-II. Charleston concedes that this was an error.

Rights appears consistent with a § 4.4 delegation rather than a complete transfer of those Declarant Rights. While this argument is not controlling, it certainly suggests that the assumption of obligations, by itself, does not evidence a transfer of the Declarant Rights.

### 2. Transfers of Declarant Rights under the REA

Indeed, the REA requires that a transfer of the Declarant Rights be made "upon sale or transfer by the Declarant of its interest in the Shopping Center," which did not occur here at the time of the purported transfers to SBP-II and BFV. (*See* REA at § 11.8; REA at § 1.5 (defining Declarant as the successor and assign of Charleston Associate who "acquire[s] all or substantially all of the then Declarant's property in the Shopping Center").)

In addition, REA § 8.1, which governs amendments to the REA, expressly requires that any amendment to the REA be recorded in Clark County. (REA at § 8.1.) It further notes that no amendment of the REA can "defeat the priority position of a first mortgagee, deed of trust beneficiary, or sale-leaseback lessor with respect to its lien or interest. . . ." (REA at § 8.1.)  Assuming for the moment that an amendment is necessary to name a new Declarant (an assumption likely accurate because the REA in its recitals names Charleston as Declarant), the lack of recording of SBP-II and BFV's interest prior to CNB's foreclosure invalidates their purported transfer.[4] Of course, CNB itself did not record any amendment to the REA before BFV did. But this is not required because, as explained below, CNB did in fact foreclose on Charleston's rights.

///

---

[4] At oral argument, Charleston argued that a transfer of the Declarant Rights does not require a recorded instrument. This defies logic: how else can a bona fide purchaser for value be appraised of the identity of the Declarant without a recorded document? Charleston's theory would result in the anomalous situation where an entity like RAS, after performing its due diligence in attempting to purchase the property, would not be able to rely on the only recorded document that identifies Charleston as the Declarant and would instead have to somehow divine the existence of a later-in-time oral transfer of those rights. This is precisely the scenario that our system of property rights seeks to avoid.

9

### 3. Transfers of Declarant Rights under Nevada recording statutes

In any event, an unrecorded transfer of a property interest is not valid against CNB as a secured creditor and RAS as a good-faith purchaser. "In Nevada, conveyances of real property must be recorded in order to impart notice to third parties and subsequent purchasers or mortgagees." *Shipman v. Wells Fargo Bank, NA*, 57950, 2012 WL 642777 (Nev. Feb. 24, 2012) (citing NRS §§ 111.315, 111.320). Their failure to record any conveyance of the interest effectively renders their conveyance void as to subsequent purchasers. NRS § 111.325.

The only way BFV LLC's subsequent REA Amendment is valid is if BFV were a subsequent purchaser for value without notice of CNB's prior foreclosure. But a bona fide purchaser "claiming title to the land by a subsequent conveyance must show that the purchase was made in good faith, for a valuable consideration; and that the conveyance of the legal title was received before notice of any equities of the prior grantee." *Berge v. Fredericks*, 591 P.2d 246, 247 (Nev. 1979). Here, there is no indication of any valuable consideration being offered by BFV for the Declarant Rights. Further, BFV's intimate relationship with Charleston defeats any claim it might have had that it was not on notice of CNB's foreclosure. *Id.* at 248 (quoting with approval a commentator who wrote that notice can be inferred where seller is "intimately associated in business" with the buyer).

Charleston argues that the statute of frauds cannot be invoked by CNB or RAS, as third parties, to invalidate the oral agreements between either Charleston and SBP-II, or SBP-II and BFV. While this may be true, Nevada's recording statutes independently require that conveyances of land be recorded in order to be valid as against subsequent purchasers for value. As a result, the Court concludes that the purported transfers to SBP-II and BFV are unenforceable and invalid.

### B. Did CNB's foreclosure transfer the Declarant Rights to CNB?

The Court finds that CNB is the proper owner of the Declarant Rights after its foreclosure of the Undeveloped Land because it foreclosed not just on the real property,

but also on the collateral associated with the real property (which includes the Declarant Rights).

### 1. Does § 11.8 of the REA apply?

The Bankruptcy Court ruled that § 11.8 of the REA controls the question of whether CNB foreclosed upon the Declarant Rights. Section 11.8, entitled "Assignment of Declarant's Rights and Obligations," governs the status of the Declarant "[u]pon sale or transfer *by the Declarant* of its interest in the Shopping Center with a concurrent transfer of its obligations as Declarant to the purchaser or transferee and the purchaser's or transferee's assumption of such obligations." (REA at § 11.8 (emphasis added).) The Bankruptcy Court erred by applying § 11.8 since that section applies by its own terms only to voluntary transfers, not involuntary foreclosures. On its face, the phrase "by the Declarant" does not apply to a foreclosure forced by the lender ─ in this case, CNB. The foreclosure sale was not an assignment of the Declarant Rights, nor was it a transfer or sale by the Declarant. Accordingly, § 11.8 is inapplicable here.[5]

### 2. Did CNB foreclose upon the Declarant Rights?

"Under Nevada law, a valid trustee's foreclosure sale terminates legal and equitable interests in the property." *Tai-Si Kim v. Kearney*, 838 F. Supp. 2d 1077, 1089 (D. Nev. 2012) (*citing Charmicor, Inc. v. Bradshaw Fin. Co.,* 550 P.2d 413, 415 (Nev. 1976)). A foreclosure sale is deemed completed once the auctioneer's hammer drops and the purchaser has paid the amount bid. *In re Grant*, 303 B.R. 205, 210 (Bankr. D. Nev. 2003). As a result, a buyer need not "assume" the rights it secures in foreclosure. This is the default rule against which the parties must expressly agree otherwise.

///

---

[5]One might argue that the existence of a Settlement Agreement removed the transfer of the real property from the ambit of a forced foreclosure into a garden-variety private transfer sufficient to trigger § 11.8, since the execution of a settlement essentially reflects a negotiated private transfer of property. But this is a flawed position: the Settlement Agreement itself provided for a foreclosure sale, thereby removing the transfer from the purview of § 11.8.

11

The Deed of Trust operated as a security agreement between the parties to the loan, and granted CNB a "security interested in each item or component of the Trust Estate." (Deed of Trust at § 14.11.) The Trust Estate expressly included the real property "[together with] all rights that Trustor [Charleston] may have as declarant under any covenants, conditions or restrictions affecting the Property." (Deed of Trust at ¶ Q.) By its terms, the Deed of Trust language includes the Declarant Rights as property of the Trust Estate. The Deed of Trust allowed CNB to unilaterally commence a foreclosure action upon Charleston's default that causes Charleston's "interest in the Trust Estate to be sold." (Deed of Trust at §§ 10.3.3, 10.3.4.)

The Settlement Agreement reached between the parties after Charleston's default provided that CNB would "*foreclose* or cause the occurrence of a deed of trust sale *with respect to the Deed of Trust*, in accordance with applicable state law." (Appendix to Br. at 416, at § 2.1(a) (emphasis added).) There is no indication in this agreement that the parties intended for CNB to *not* foreclose on the entire Trust Estate, as laid out in the Deed of Trust to which § 2.1(a) refers. The operative documents, and common sense, require interpreting the Settlement Agreement to mean that CNB's foreclosure transfers *all* of Charleston's interests in the Trust Estate.

Charleston argues that CNB only foreclosed on the land, and not on any of the collateral, by pointing to the Settlement Agreement's definition of Property. (Appendix to Br. at 415 (defining "Property" as "certain real property located in Clark County . . . as more fully described in Exhibit A"); Appendix to Br. at 425 (entitled Exhibit A, "Legal Description of Certain Property of Borrower," and containing only a legal description of the real estate plot of the land).) But this definition does not carry the day. The parties' express agreement that CNB would "foreclose" on the Deed of Trust is evidence enough of their intention that CNB take all collateral to the loan.  Including the term "with respect to the Deed of Trust" creates the default rule upon which the parties must operate; Charleston's failure to seek an express limitation of CNB's rights to foreclose only on the real property renders its arguments invalid. Even though "Property" is only defined as the

real property in the Settlement Agreement, that point is irrelevant. Section 2.1(a), the operative clause of the agreement, does not limit CNB's foreclosure sale to the Property.

Charleston further relies on the actual deed that CNB purchased at the foreclosure sale, which only describes real property and does not mention any other interests. (*See* Appendix to Br. at 439 (conveying to CNB "the real property in the County of Clark, State of Nevada" described by an attached exhibit that mentions only real property).) But having already determined that the Settlement Agreement evidences the parties' intent to have CNB foreclose on the entire bundle of sticks offered as collateral to its loan, its conduct post-foreclosure is irrelevant to whether the foreclosure effectuated a transfer of the Declarant Rights. Similarly, whatever post-foreclosure actions that the parties engaged in — i.e. maintenance and operation of common areas, maintaining insurance coverage, paying real property taxes, or disputing the proper ownership of the Declarant Rights — bears no relationship to the legal import of the parties' Settlement Agreement. Because the express terms of the Settlement Agreement support CNB's position, the Court need not look beyond those terms in the absence of any ambiguity as to the Agreement's interpretation.[6]

### C.  Did CNB violate the automatic stay?

Having determined that CNB secured the Declarant Rights by foreclosing upon the Deed of Trust, the Court need not determine whether those Rights run with the land. Likewise, having determined that CNB obtained the Declarant Rights, it consequently did not violate the automatic stay when it recorded its interest in the Declarant Rights. The filing of a bankruptcy petition stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). A debtor's bankruptcy estate includes "all legal or equitable

---

[6] At best, the post-foreclosure conduct of the parties is consistent with a genuine dispute having arisen between them over the true ownership of the Declarant Rights. Further, the fact that CNB may not have perfected its title — i.e., protected its interest against claims of third parties by providing notice — does not render invalid a completed foreclosure sale. *See Humana, Inc. v. Nguyen*, 728 P.2d 816, 817 (Nev. 1986).

interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Here, because CNB's foreclosure divested the Declarant Rights from Charleston's assets, CNB's recording of its interest in the Rights and its subsequent transfer to RAS did not burden Charleston's bankruptcy estate and did not violate the automatic stay. *See In re Grant*, 303 B.R. at 209 (holding that "a trustee's foreclosure sale effectively transfers all legal and equitable interests in property at the time of the sale").

**IV.   CONCLUSION**

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the appeal.

IT IS HEREBY ORDERED that that the decision of the Bankruptcy Court is REVERSED and the case REMANDED with instructions for the Bankruptcy Court to award summary judgment in favor of CNB and RAS.

IT IS SO ORDERED.

DATED THIS 25th day of July 2013.

MIRANDA M. DU
UNITED STATES DISTRICT COURT